STEVEN A. NICHOLS (State Bar No. 92413)
snichols@rutan.com
GEORGE GORMAN (State Bar No. 274628)
ggorman@rutan.com
RUTAN & TUCKER, LLP
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Telephone: 714-641-5100
Facsimile: 714-546-9035

Attorneys for Defendant and Counterclaimant SB AVIATION, Inc. and Counterclaimant SCOTT BIONDO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ONYX JET GROUP, LLC,

Plaintiff,

v.

CHARTER FLIGHT GROUP, LLC and SB AVIATION, INC.,

Defendant.

SB AVIATION, INC. and SCOTT BIONDO,

Counterclaimants,

v.

ONYX JET GROUP, LLC, JORDAN BROWN, AARON STANZ, BOWMAN AVIATION, LLC, JET GENIUS, INC., and CHARTER FLIGHT GROUP, LLC

Counter-Defendants.

Case No. 3:14-cv-00974-JAH-DHB

**(1) DEFENDANT SB AVIATION, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT; AND**

**(2) COUNTERCLAIMANTS SB AVIATION, INC. AND SCOTT BIONDO'S COUNTERCLAIMS AGAINST ONYX JET GROUP LLC, JORDAN BROWN, AARON STANZ, BOWMAN AVIATION, LLC, and JET GENIUS, INC.**

**DEMAND FOR JURY TRIAL**

## ANSWER

Defendant SB Aviation, Inc. ("SB"), for itself alone, by and through its attorneys, Rutan & Tucker, LLP, answers the Complaint filed on or about April 21, 2014 on behalf of Onyx Jet Group, LLC ("Onyx"), as follows:

1. SBA denies that SBA has accused Plaintiff of breaching fiduciary duties owed to Defendants. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that Defendant Charter Flight Group LLC ("CFG") has accused Plaintiff of breaching fiduciary duties owed to Defendants, and on that basis denies that allegation. SBA admits that SBA has accused Plaintiff of violating the contractual rights of Defendants. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that CFG has accused Plaintiff of violating the contractual rights of Defendants, and on that basis denies that allegation. SBA admits that SBA has accused Plaintiff of violating other rights of Defendants. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that CFG has accused Plaintiff of violating other rights of Defendants, and on that basis denies that allegation. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that Plaintiff owes no fiduciary duties to Defendants, and on that basis denies that allegation. SBA denies that Plaintiff has violated no contractual or other rights of Defendants. SBA admits that Defendants have claimed ownership of certain intellectual property rights and other assets, but denies that said rights and assets belong to Plaintiff. Except as otherwise expressly alleged herein, SBA denies each and every allegation of paragraph 1 of the Complaint.

2. SBA admits the allegations in paragraph 2 of the Complaint.

3. SBA admits the allegations in paragraph 3 of the Complaint.

4. SBA admits that venue is proper in this judicial district. Except as otherwise expressly admitted, SBA denies the allegations in paragraph 4 of the Complaint.

5. SBA admits the allegations in paragraph 5 of the Complaint.

6. SBA admits the allegations in paragraph 6 of the Complaint.

7. SBA admits the allegations in paragraph 7 of the Complaint.

8. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that "Jordan Brown owns 100% of Bowman," and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA admits the allegations in paragraph 8 of the Complaint.

9. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations that "Mr. Brown has been in the aviation charter industry for more than 15 years and has developed a substantial clientele of repeat customers. Mr. Brown also owns 99% of the membership interests of the Plaintiff, Onyx. Onyx . . . was formed . . . on March 22, 2010," and on that basis denies these allegations. SBA admits that Onyx is a California limited liability company. SBA admits that "both CFG and Onyx provide aviation charter services" and that "CFG provides those services to *new* clients sourced through Internet marketing." Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 9 of the Complaint.

10. SBA admits that "Mr. Brown and Mr. Biondo initially met when Mr. Biondo responded to an advertisement that Mr. Brown placed." SBA is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 10 of the Complaint, and on that basis denies those allegations.

11. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 11 of the Complaint, and on that basis denies those allegations.

12. SBA admits the allegations that, in April 2012, Mr. Biondo responded to the advertisement seeking to work for Mr. Brown and that Mr. Brown and Mr. Biondo discussed Mr. Biondo's experience and qualifications. SBA is without

sufficient knowledge or information to form a belief as to the truth of the allegation that "Mr. Biondo's skill set and experience did not match everything that Mr. Brown was looking for so Mr. Brown continued to search for the right individual," and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 12 of the Complaint.

13. SBA admits the allegation that, in approximately June 2012, Mr. Brown shared with Mr. Biondo a list of keywords and keyword-related domain names and that Mr. Biondo began to work on behalf of Onyx. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that said keywords were "proprietary," and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 13 of the Complaint.

14. SBA admits the allegation that "Mr. Biondo was enthusiastic and worked hard." SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations that "[b]y the late summer of 2012, Mr. Brown had a fairly good idea of Mr. Biondo's strengths and weaknesses" and "[t]he keyword advertising campaign conducted by Mr. Biondo had lost money," and on that basis denies those allegations. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 14 of the Complaint.

15. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Complaint, and on that basis denies those allegations.

16. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Complaint, and on that basis denies those allegations.

17. SBA denies the allegations that "Mr. Biondo did not have the necessary website construction skills to build the CFG Website" and that "Mr. Renner has assigned all of his rights, including copyrights, in his work product to Onyx."

Except as otherwise expressly alleged herein, SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, and on that basis denies those allegations.

18. SBA admits the allegations that Mr. Biondo had "the task of sourcing and hiring other contractors to develop text content and develop and execute backlink strategies" and "the general task of completing the CFG Website." SBA further admits the allegations that Mr. Biondo had "overall enthusiasm" and "dedication to hard work." Except as otherwise expressly admitted, SBA denies the allegation in paragraph 18 of the Complaint.

19. SBA denies the allegations in paragraph 19 of the Complaint.

20. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that "[d]uring that time, all expenses relating to the CFG Website project were paid either by Mr. Brown personally or Onyx," and on that basis denies those allegations. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 20 of the Complaint.

21. SBA denies the allegations in paragraph 21 of the Complaint.

22. SBA denies the allegations in paragraph 22 of the Complaint.

23. SBA admits the allegations that CFG is structured as an LLC, that SBA is 100% owned by Mr. Biondo and that it holds a 50% membership interest in CFG, that Bowman holds a 40% interest in CFG, and that Aaron Stanz holds a 10% interest in CFG. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations that Bowman is 100% owned by Mr. Brown, that "Mr. Stanz is a longtime acquaintance, friend and business partner of Mr. Brown," that "[Mr. Stanz] has a deep knowledge of programming, Internet marketing and the charter aviation industry," and that "[a]t the request of Mr. Brown, Mr. Stanz assisted with the CFG Website project," and on that basis denies those allegations. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 23 of the Complaint.

24. SBA admits the allegations that Mr. Biondo knew that "Mr. Brown would continue to operate Onyx . . . separate and apart from CFG," and that "Mr. Brown has continued to operate Onyx and other business generally relating to the charter aviation industry." SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that "since well before the formation of CFG in December of 2012 . . . Mr. Brown [had] operate[d] Onyx and other businesses generally relating to the charter aviation industry," and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations of paragraph 24 of the Complaint.

25. SBA admits the allegations that the Articles of Organization for CFG were filed in December 2012, that Bowman, SBA, and Mr. Stanz executed an operating agreement for CFG in January 2013, and that "the CFG Domain Name, the work product of Mr. Renner, Ms. Goodell and Mr. Belemonti and the rights, including copyrights, in that work product" were used by CFG. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that Onyx paid the filing fees for CFG, and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations of paragraph 25 of the Complaint.

26. SBA admits the allegation that Mr. Biondo was one of the individuals who operated CFG. Except as otherwise expressly admitted, SBA denies each and every allegation of the portion of paragraph 26 that precedes subsection a thereto.

a. SBA admits the allegations that copyright infringement claims were asserted against CFG based on the alleged use of images on the CFG Website and that one of those claims was settled. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that "[t]he six removal cases could have easily resulted in settlements for financial restitution had it not been for Mr. Stanz's interceding in the resolution of those claims and the offended copyright owners being satisfied with CFG's compliant response to the warnings,"

and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 26(a) of the Complaint.

b. SBA denies the allegations in paragraph 26(b) of the Complaint.

c. SBA denies the allegations in paragraph 26(c) of the Complaint.

d. SBA is without sufficient knowledge or information to form a belief as to the truth of the allegation that "CFG suffered a $40,000 revenue loss," and on that basis denies that allegation. Except as otherwise expressly alleged herein, SBA denies the allegations in paragraph 26(d) of the Complaint.

e. SBA denies the allegations in paragraph 26(e) of the Complaint.

i. SBA admits the allegation that CFG hired an employee to perform sales-related duties. Except as otherwise expressly admitted herein, SBA denies the allegations in paragraph 26(e)(i) of the Complaint.

ii. SBA denies the allegations in paragraph 26(e)(ii) of the Complaint.

iii. SBA denies the allegations in paragraph 26(e)(iii) of the Complaint.

iv. SBA denies the allegations in paragraph 26(e)(iv) of the Complaint.

27. SBA admits the allegation that CFG was "successful and grew." Except as otherwise expressly admitted, SBA denies the allegations in paragraph 27 of the Complaint.

28. SBA admits the allegations that "Mr. Brown operates and has interests in other business relating to the charter aviation industry including Onyx" and that "Mr. Stanz is involved in some of those businesses." Except as otherwise expressly admitted, SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 28 of the Complaint, and on that basis denies those allegations.

29. SBA is without sufficient knowledge or information to form a belief as

to the truth of the allegations in paragraph 29 of the Complaint, and on that basis denies those allegations.

30. SBA admits the allegations that "[i]n November of 2013, Mr. Brown and Mr. Stanz approached Mr. Biondo, explained the Jet Genius opportunity and proposed terms by which Mr. Biondo could be involved" and that "Mr. Biondo was offered a minority ownership interest in Jet Genius as well as a salaried position." SBA denies the allegations that "Mr. Biondo verbally agreed to the terms." Except as otherwise expressly alleged herein, SBA is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 30 of the Complaint, and on that basis denies those allegations.

31. SBA denies the allegations in paragraph 31 of the Complaint.

32. SBA admits the allegations that Mr. Biondo has asserted that "CFG, not Onyx, owns the CFG Domain Name, the CFG Website and the associated copyrights and other intellectual property" and that "the relationship between Mr. Biondo and Messrs. Brown and Stanz has soured." Except as otherwise expressly admitted herein, SBA denies the allegations in paragraph 32 of the Complaint.

33. SBA admits the allegations in paragraph 33 of the Complaint.

**FIRST CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**

**(DEFINITION AND OWNERSHIP OF COPYRIGHTS AND OTHER INTELLECTUAL PROPERTY RIGHTS)**

34. SBA incorporates herein by this reference all of the foregoing paragraphs of this Answer.

35. SBA admits the allegation that CFG has claimed ownership of the CFG Website and other intellectual property rights used by CFG. Except as otherwise expressly admitted herein, SBA denies the allegations in paragraph 35 of the Complaint.

36. SBA admits the allegations in paragraph 36 of the Complaint.

## SECOND CLAIM FOR RELIEF

## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

## (OWNERSHIP OF CFG DOMAIN NAME AND OTHER PROPERTY)

37. SBA incorporates herein by this reference all of the foregoing paragraphs of this Answer.

38. SBA admits the allegation that CFG has claimed ownership of the CFG Domain Name and certain other personal property used by CFG. Except as otherwise expressly admitted herein, SBA denies the allegations in paragraph 38 of the Complaint.

39. SBA admits the allegations in paragraph 39 of the Complaint.

## THIRD CLAIM FOR RELIEF

## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

## (ONYX HAS NO DUTIES AND OBLIGATION TO CFG AND MAY TERMINATE CFG'S USE OF ONYX'S PERSONAL AND INTELLECTUAL PROPERTY)

40. SBA incorporates herein by this reference all of the foregoing paragraphs of this Answer.

41. SBA admits the allegation that SBA, through its counsel, has alleged that Onyx's operation breaches duties owed to CFG as well as contractual and other rights of CFG. Except as otherwise expressly admitted herein, SBA denies the allegations in paragraph 41 of the Complaint.

42. SBA admits the allegations in paragraph 42 of the Complaint.

## AFFIRMATIVE DEFENSES

### *FIRST AFFIRMATIVE DEFENSE*

### (Failure To State A Claim For Relief)

43. The Complaint, and each purported claim for relief alleged therein, fails to state facts sufficient to constitute any claim for relief.

### *SECOND AFFIRMATIVE DEFENSE*

**(Consent)**

44. The Complaint, and each purported claim for relief alleged therein, is barred by virtue of Plaintiff's consent and/or acquiescence to the acts or omissions of SBA alleged in the Complaint.

### *THIRD AFFIRMATIVE DEFENSE*

**(Waiver)**

45. The Complaint, and each purported claim for relief alleged therein, is barred by virtue of Plaintiff's waiver of any rights relating to the matters alleged in the Complaint.

### *FOURTH AFFIRMATIVE DEFENSE*

**(Estoppel)**

46. The Complaint and each purported claim for relief alleged therein is barred because Plaintiff is estopped from seeking any relief relating to the matters alleged in the Complaint.

### *FIFTH AFFIRMATIVE DEFENSE*

**(Unclean Hands)**

47. The Complaint and each purported claim for relief alleged therein is barred due to Plaintiff's unclean hands in connection with the matters alleged in the Complaint.

### *SIXTH AFFIRMATIVE DEFENSE*

**(Good Faith)**

48. The Complaint, and each purported claim for relief alleged therein, is barred because SBA at all times acted in good faith in connection with the matters alleged in the Complaint.

### *SEVENTH AFFIRMATIVE DEFENSE*

**(Laches)**

49. The Complaint, and each purported claim for relief alleged therein, is

barred by the doctrine of laches because, among other things, Plaintiff unreasonably delayed asserting the purported rights alleged in the Complaint and SBA has been prejudiced as a result of such delay.

### *EIGHTH AFFIRMATIVE DEFENSE*

**(Approval and Ratification)**

50. The Complaint, and each purported claim for relief alleged therein, is barred because Plaintiff approved, authorized, and/or ratified the actions and transactions alleged in the Complaint and is accordingly precluded from any recovery.

### *NINTH AFFIRMATIVE DEFENSE*

**(Failure To Join Indispensable Parties)**

51. The Complaint, and each purported claim for relief alleged therein, is barred because Plaintiff failed to join indispensable parties including, but not limited to, all of the members of CFG.

### *TENTH AFFIRMATIVE DEFENSE*

**(Privilege And Justification)**

52. The Complaint, and each purported claim for relief alleged therein, is barred because the acts or omissions of SBA alleged in the Complaint were privileged and/or justified.

### *ELEVENTH AFFIRMATIVE DEFENSE*

**(Business Judgment Rule)**

53. The Complaint, and each purported claim for relief alleged therein, is barred because the acts or omissions of SBA alleged in the Complaint are protected by the Business Judgment Rule.

### *TWELFTH AFFIRMATIVE DEFENSE*

**(Copyright Misuse)**

54. The Complaint, and each purported claim for relief alleged therein, is barred by the doctrine of copyright misuse.

*THIRTEENTH AFFIRMATIVE DEFENSE*

**(Copyright Invalidity)**

55. The Complaint, and each purported claim for relief alleged therein, is barred by the doctrine of copyright invalidity.

*FOURTEENTH AFFIRMATIVE DEFENSE*

**(Independent Creation)**

56. The Complaint, and each purported claim for relief alleged therein, is barred by the doctrine of independent creation.

*ADDITIONAL AFFIRMATIVE DEFENSES*

57. There may be additional affirmative defenses to Plaintiff's alleged claims for relief which are currently unknown. SBA reserves the right to seek leave from the Court to amend this Answer to allege additional affirmative defenses in the event discovery or other information indicates they are appropriate.

WHEREFORE, SBA prays for judgment as follows:

A. That Plaintiff take nothing by reason of the Complaint and that the Complaint be dismissed in its entirety and with prejudice;

B. That SBA be awarded its costs of suit incurred herein;

C. That SBA be awarded its attorneys' fees incurred herein; and

D. That the Court grant such other relief as it deems just and proper.

Dated: June 17, 2014

RUTAN & TUCKER, LLP
STEVEN A. NICHOLS
GEORGE GORMAN

By: /s/ George Gorman
George Gorman
Attorneys for Defendant and Counter-Claimant SB Aviation, Inc. and Counter-Claimant Scott Biondo

# COUNTERCLAIM

Counter-Claimants Scott Biondo ("Mr. Biondo") and SB Aviation, Inc. ("SBA," and collectively with Mr. Biondo "Counter-Claimants") bring this action individually and derivatively on behalf of Charter Flight Group LLC ("CFG") and allege as follows:

## *The Parties*

1. Counter-Claimant SBA is a California corporation, with its principal place of business in Carlsbad, California.

2. Counter-Claimant Mr. Biondo is an individual residing in San Diego County, California who owns 100% of SBA.

3. Counter-Claimants are informed and believe that Counter-Defendant Jordan Brown ("Mr. Brown") is an individual residing in San Diego County, California.

4. Counter-Claimants are informed and believe that Counter-Defendant Bowman Aviation, Inc. ("Bowman") is a California corporation with its principal place of business in San Diego, California. Counter-Claimants are further informed and believe that Mr. Brown owns 100% of the interests in Bowman.

5. Counter-Claimants are informed and believe that Counter-Defendant Aaron Stanz ("Mr. Stanz") is an individual residing in San Diego County, California.

6. Counter-Claimants are informed and believe that Counter-Defendant Onyx Jet Group LLC ("Onyx") is a California limited liability company with its principal place of business in Carlsbad, California. Counter-Claimants are further informed and believe that Mr. Brown holds a 99% interest in Onyx and that Mr. Brown's spouse, Stacy Brown, holds a 1% interest in Onyx.

7. Counter-Claimants are informed and believe that Counter-Defendant Jet Genius, Inc. ("Jet Genius") is a California corporation with its principal place of business in Carlsbad, California. Counter-Claimants are further informed and

believe that Mr. Brown and Mr. Stanz hold some ownership interest in Jet Genius.

8. Mr. Brown, Mr. Stanz, Bowman, Onyx, and Jet Genius are collectively referred to herein as the "Counter-Defendants."

9. CFG is a California limited liability company with its principal place of business in Carlsbad, California. SBA is a member of CFG with a 50% membership interest. Bowman is a member of CFG with a 40% membership interest. Mr. Stanz is a member of CFG with a 10% membership interest. Mr. Brown and Mr. Biondo are the managers of CFG.

### *Jurisdiction and Venue*

10. This Court has original subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1331 and 1338 and supplemental jurisdiction over the Complaint pursuant to 28 U.S.C. § 1367.

11. This Court also has original subject matter jurisdiction over the Counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338 and supplemental jurisdiction over the Counterclaim pursuant to 28 U.S.C. § 1367, in part because one or more of the claims alleged in the Counterclaim are compulsory and those claims that are not compulsory arise out of the same "common nucleus of operative facts" as the purported claims for relief alleged in the Complaint.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, all Counter-Defendants reside in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims alleged in the Counterclaim occurred in this District

### *GENERAL ALLEGATIONS*

13. Mr. Biondo has years of experience in the internet marketing business and specializes in, among other things, website design, marketing strategies, search engine optimization, internet advertising, and related areas.

14. In approximately April 2012, Mr. Biondo contacted Mr. Brown in

response to Mr. Brown's advertisement seeking an individual with appropriate technical skills to manage and develop an internet marketing plan.

15. Mr. Brown initially retained Mr. Biondo to manage an internet advertising campaign for Onyx, which, on information and belief, is an aviation charter brokerage company owned by Counter-Defendant Mr. Brown and his spouse. Mr. Brown expressed satisfaction with Mr. Biondo's work and stated his desire that Mr. Biondo perform additional work.

16. Accordingly, in approximately the middle of 2012, Mr. Biondo and Mr. Brown decided to form a company (which would later be established as CFG) in order to service the market for aircraft charters through internet marketing channels.

17. Mr. Biondo and Mr. Brown agreed that Onyx, Mr. Brown's existing company, would continue to operate solely to service Onyx's and Mr. Brown's *existing* clients, and that the company Mr. Biondo and Mr. Brown planned to form would have exclusive access to *new* clients through internet marketing channels. Key to this arrangement was Mr. Brown's promise that neither Onyx nor any other company operated by, or affiliated with, Mr. Brown, would compete with the new company that Mr. Brown and Mr. Biondo planned to form.

18. As part of their plan, Mr. Biondo and Mr. Brown agreed that they would each have a 50% ownership interest in the contemplated company. They further agreed that Mr. Biondo was to contribute "sweat equity" to the endeavor by acting as project manager for the business with primary responsibility for all aspects of marketing while Mr. Brown would contribute the necessary capital.

19. In approximately the middle of 2012, and on several occasions thereafter, Mr. Brown assured Mr. Biondo that all of the work performed by Mr. Biondo and any of the intellectual property and other assets that he developed and/or participated in developing would be owned by the company Mr. Biondo and Mr. Brown planned to form. Mr. Brown further assured Mr. Biondo that any assets purchased by Mr. Brown for use in connection with the planned company (based on

his status as the contributor of capital to the endeavor) would belong to that company. Mr. Biondo relied on these assurances by performing substantial work for the benefit of the business for little or no monetary compensation.

20. At around the same time, Mr. Biondo came up with the "Charter Flight Group" name for the planned business. Counter-Claimants are informed and believe that shortly after Mr. Biondo informed Mr. Brown of that name, Mr. Brown purchased the domain name "www.charterflightgroup.com." Consistent with Mr. Brown's prior representations that any assets purchased by Mr. Brown for use in connection with the planned company (based on his status as the contributor of capital to the endeavor) would belong to that company, Mr. Biondo believed that the domain name would be an asset of the company once it was formed.

21. Beginning in mid 2012, Mr. Biondo worked tirelessly to create the Charter Flight Group website and exercised his internet marketing skills to ensure that the website would be highly visible and attractive to new clients. In addition, several contractors were employed to assist with the creation of the Charter Flight Group website. Again, consistent with Mr. Brown's representations, Mr. Biondo believed that the website and all of the work product of Mr. Biondo and the contractors would become assets of the company once it was formed.

22. Despite Mr. Biondo's repeated requests, no formal operating agreement or articles of organization had yet been signed and/or filed for the company the parties agreed would operate and own the Charter Flight Group business. Instead, based on assurances by Mr. Brown, Mr. Biondo diligently worked without substantial compensation under the belief that his work would inure to the benefit of the planned business in which Mr. Biondo would have a 50% ownership interest.

23. The Charter Flight Group website was completed in approximately December 2012. Counter-Claimants are informed and believe that, around the same time, Mr. Brown filed the articles of organization for CFG.

24. In January 2013, an operating agreement for CFG was finally executed.

A true and correct copy of the CFG operating agreement (the "Operating Agreement") is attached hereto as **Exhibit 1**.

25. Pursuant to the Operating Agreement: (1) SBA, a corporation wholly owned by Mr. Biondo, is a member of CFG with a 50% membership interest; (2) Bowman, which, on information and belief, is a corporation wholly owned by Mr. Brown, is a member of CFG with a 40% membership interest; and (3) Mr. Stanz is a member with a 10% membership interest. In addition, Mr. Brown and Mr. Biondo are the managers of CFG.

26. Consistent with Mr. Brown's assurances that CFG would be the sole vehicle for servicing new aircraft charter clients through internet marketing channels, Section 5.7 of the Operating Agreement provides as follows:

> Competing Activities. The Managers and their officers, directors, shareholders, partners, members, agents, employees and Affiliates may not engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.

27. Both prior to and after the formal organization of CFG, the aviation charter business associated with CFG was largely successful. This success was primarily, if not entirely, attributable to Mr. Biondo's hard work and skill. In fact, unlike Mr. Biondo, Mr. Brown and Mr. Stanz did little or no work for CFG.

28. Instead, Counter-Claimants are informed and believe that Mr. Brown and Mr. Stanz chose to spend their time pursuing other projects and ventures, some of which were in direct competition with CFG in violation of the Operating Agreement. Mr. Brown and Mr. Stanz's derelictions of duty caused harm to CFG by, among other things, requiring CFG to needlessly spend money hiring employees and contractors to perform work that should have been done by Mr. Brown and Mr. Stanz.

29. Prior to and since the formation of CFG, Counter-Defendants have

undertaken efforts to force Mr. Biondo and SBA out of CFG, to compete with CFG, and to misappropriate CFG's assets for their personal gain.

30. Counter-Claimants are informed and believe that Mr. Brown and Onyx purchased an existing aviation charter company domain name called "TheJetEdge.com" and used that domain name to allow Mr. Brown and Onyx to secure new charter clients through online marketing channels, which is a market segment the parties expressly agreed would be the sole province of CFG.

31. Counter-Claimants are informed and believe that Mr. Brown, Bowman, and Mr. Stanz caused CFG to pay for useless and over-priced services provided by other entities controlled by Mr. Brown, such as an entity known as "Jet Exchange," and that the funds comprising CFG's payment for such services were on at least one occasion deposited into the personal account of Mr. Stanz.

32. Counter-Claimants are informed and believe that Mr. Brown, Bowman, and Mr. Stanz caused CFG to pay excessive rent as part of a scheme to use CFG's assets to finance, among other things, Mr. Brown, Mr. Stanz, and Onyx's failing Jet Exchange business.

33. Counter-Claimants are informed and believe that Mr. Brown, Bowman, Mr. Stanz, and Onyx have engaged in efforts to have at least one contract belonging to CFG be reissued in Onyx's favor.

34. Mr. Brown, Bowman, Mr. Stanz, and Onyx have also asserted that it is Onyx, not CFG, that owns substantially all of the assets and intellectual property associated with CFG, including its website, domain name, and the work product created by and/or at the direction of Mr. Biondo and third-party contractors employed by CFG.

35. In early 2014, Mr. Brown, Bowman, Mr. Stanz, and Onyx attempted to force a buy-out of SBA's 50% interest in CFG for little or no consideration. Specifically, Mr. Biondo was cornered by Mr. Brown and Mr. Stanz and offered the following ultimatum: either (1) agree to merge SBA's 50% interest in CFG into Jet

Genius (a separate company which, on information and belief, was created and is owned by Mr. Brown and Mr. Stanz) for a miniscule equity stake in Jet Genius; or (2) CFG would be dissolved, with no further non-competition obligations on the part of Mr. Brown, Onyx, Mr. Stanz, or any other competing entity that they may own or operate.

36. Neither of these proposals was acceptable to Mr. Biondo and SBA. With respect to the proposed merger of SBA's interest in CFG into Jet Genius, that proposal was unacceptable because the value of the proposed equity stake in Jet Genius paled in comparison to the value of SBA's 50% interest in CFG. With respect to the threatened dissolution of CFG, that proposal (again, more accurately characterized as a threat) was similarly unacceptable because any purported payout to SBA for its interest in CFG would be grossly undervalued in light of Mr. Brown, Bowman, Mr. Stanz, and Onyx's assertion that it was Onyx, and not CFG, that owned CFG's intellectual property and assets.

37. When Mr. Biondo and SBA rejected Counter-Defendants' proposals, Mr. Brown and Mr. Stanz became infuriated and intensified their campaign against Counter-Claimants.

38. Counter-Claimants are informed and believe that Mr. Brown and Mr. Stanz are actively operating or attempting to operate Jet Genius as a business in direct competition with CFG, in violation of the terms of the Operating Agreement and Mr. Brown, Bowman and Mr. Stanz's fiduciary obligations as members and/or managers of CFG.

39. Counter-Claimants are informed and believe that Mr. Brown, Mr. Stanz, Bowman, and Onyx have undertaken efforts to secure agreements from the contractors hired by CFG to perform work for and on behalf of CFG purporting to assign all of the rights to their work product to Onyx. Counter-Claimants are further informed and believe that these purported assignment agreements have frequently been presented under false pretenses, without full disclosure of their intended effect,

and that Mr. Brown has also offered to pay money to at least one contractor as an improper inducement to sign the agreement.

40. In approximately April 2014, Mr. Biondo discovered that someone had, without authorization, accessed his personal email account and, among other things, forwarded to Mr. Brown's Onyx email account confidential and privileged communications between Mr. Biondo and his counsel. Counter-Claimants are informed and believe that it was Mr. Brown, or someone acting at his direction, who engaged in this illegal conduct and that the emails and documents accessed included more than just Mr. Biondo's privileged communications with his counsel.

41. On April 9, 2014, Mr. Biondo's counsel sent Mr. Brown and Onyx's counsel a cease and desist letter demanding that Onyx and Mr. Brown immediately cease their misappropriation of CFG's assets and their operation of businesses in direct competition with CFG.

42. Despite this demand, Mr. Brown and Onyx have refused to do so. Instead, Onyx filed suit against SBA and CFG seeking a declaratory judgment that, among other things, it is Onyx, and not CFG, that owns CFG's assets, and that Mr. Brown is free to operate Onyx as a competing business notwithstanding the restriction on competition set forth in the Operating Agreement and notwithstanding Mr. Brown and Bowman's fiduciary obligations to CFG, SBA, and Mr. Biondo.

43. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG to seek redress for the wrongs alleged in this Counterclaim. This action is not a collusive action to confer jurisdiction that the Court would otherwise lack. As alleged above, SBA, through Mr. Biondo, has made demand on CFG's management, including Mr. Brown, to immediately cease the misconduct alleged herein, but Mr. Brown has refused to do so.

/ / /

/ / /

/ / /

## FIRST CAUSE OF ACTION

**(Derivative Claim on Behalf of CFG for Breach of Fiduciary Duty)**

44. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

45. Mr. Brown, as a manager of CFG, and Bowman and Mr. Stanz, as members of CFG, owe CFG fiduciary duties of care and loyalty pursuant to California law.

46. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG to enforce the rights of CFG as against any third party, including, without limitation, Mr. Brown, Bowman, and Mr. Stanz.

47. The above-averred actions and omissions of Mr. Brown, Bowman, and Mr. Stanz constituted breaches of their fiduciary duties to CFG and were the products of self-dealing and self-interest, and therefore not the product of a valid exercise of business judgment.

48. Further, the above-averred actions and omissions of Mr. Brown, Bowman, and Mr. Stanz constituted either a complete failure to manage or, at a minimum, grossly negligent and reckless mismanagement of CFG.

49. As a direct result of the breaches of duty by Mr. Brown, Bowman, and Mr. Stanz, CFG has been directly and proximately harmed. SBA, suing derivatively on behalf of CFG, seeks damages, according to proof at trial, for all of the harm caused by the acts of these Counter-Defendants.

50. Mr. Brown, Bowman, and Mr. Stanz engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of CFG, and in engaging the acts or omissions alleged herein, were guilty of oppression and malice. Accordingly, SBA, on behalf of CFG, seeks punitive and exemplary damages in an amount according to proof at trial.

51. CFG owns and/or is interested in the property and assets of CFG. Due to Mr. Brown's, Bowman's, and Mr. Stanz's misconduct and breaches of fiduciary

duties to CFG, the property and assets of CFG are being, or are in imminent danger of being, materially injured and misappropriated, and the value of CFG's business operations is being, or is in imminent danger of being, diminished and threatened. Accordingly, the appointment of a receiver for CFG is necessary and proper to preserve the property and rights of CFG.

52. In addition, Mr. Brown's, Bowman's, and Mr. Stanz's misconduct and breaches of fiduciary duties to CFG have caused, and will cause irreparable harm to CFG for which there is no adequate monetary compensation. Accordingly, injunctive relief is appropriate.

53. In addition, CFG owns and/or is interested in the property and assets of CFG, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property. Mr. Brown, Bowman, and Mr. Stanz have wrongfully acquired, attempted to acquire, and/or claimed an ownership interest in, some or all of the foregoing property and assets of CFG. Counter-Claimants are informed and believe that Mr. Brown, Bowman, and Mr. Stanz have also transferred and/or attempted to transfer the rights to the foregoing property and assets of CFG to Onyx, Jet Genius, and other entities. Accordingly, a constructive trust should be imposed over the property and assets of CFG with respect to which Mr. Brown, Bowman, and Mr. Stanz have claimed title, possession, and/or ownership, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property, and Mr. Brown, Bowman, Mr. Stanz, and any other persons or entities who possess said property and assets should be treated as involuntary trustees of said property and assets for the benefit of CFG.

54. Section 12.18 of the Operating Agreement provides, in relevant part: "[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and

expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly SBA, suing derivatively on behalf of CFG, is entitled to recover attorneys' fees and costs and other expenses incurred in connection with this dispute.

**SECOND CAUSE OF ACTION**

**(Direct Claim on Behalf of SBA for Breach of Fiduciary Duty)**

55. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

56. Mr. Brown, as a manager of CFG, and Bowman and Mr. Stanz, as members of CFG, owe SBA, also a member of CFG, fiduciary duties of care and loyalty pursuant to California law.

57. The above-averred actions and omissions of Mr. Brown, Bowman, and Mr. Stanz constituted breaches of their fiduciary duties to SBA and were the products of self-dealing and self-interest, and therefore not the product of a valid exercise of business judgment.

58. Because the above-averred actions and omissions resulted in an injury to SBA's membership interest in CFG, distinct from any injury caused to CFG itself, SBA has standing to bring a direct action against Mr. Brown, Bowman, and Mr. Stanz.

59. As a direct result of the breaches of duty by Mr. Brown, Bowman, and Mr. Stanz, SBA has been directly and proximately harmed. SBA seeks damages, according to proof at trial, for all of the harm caused by the acts of these Counter-Defendants.

60. Mr. Brown, Bowman, and Mr. Stanz engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of SBA, and in engaging the acts or omissions alleged herein, were guilty of oppression and malice. Accordingly, SBA seeks punitive and exemplary damages in an amount according to proof at trial.

61. In addition, Mr. Brown, Bowman, and Mr. Stanz's misconduct and breaches of fiduciary duties to SBA have caused, and will cause irreparable harm to SBA for which there is no adequate monetary compensation. Accordingly, injunctive relief is appropriate.

62. Section 12.18 of the Operating Agreement provides, in relevant part: "[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly SBA is entitled to recover the attorneys' fees and costs and other expenses incurred in connection with this dispute.

## THIRD CAUSE OF ACTION

## (Breach of Contract)

63. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

64. Pursuant to section 5.7 of the Operating Agreement, Mr. Brown, Bowman, and Mr. Stanz "may not engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to [CFG's] business and that might be in direct or indirect competition with [CFG]."

65. SBA has performed each and every covenant, condition and obligation required under the Operating Agreement, except those covenants, conditions and obligations which were excused by the conduct of Mr. Brown, Bowman, and Mr. Stanz, including, without limitation, their prior material breaches as alleged herein.

66. Mr. Brown, Bowman and Mr. Stanz have materially breached the Operating Agreement by, on information and belief, operating, engaging in, and/or investing in one or more businesses that are in direct competition with CFG,

including but not limited to Onyx and Jet Genius.

67. As a result of Mr. Brown, Bowman and Mr. Stanz's breaches of the Operating Agreement, SBA has suffered and will continue to suffer damages in an amount to be proved at trial.

68. In addition, Mr. Brown, Bowman, and Mr. Stanz's breaches of the Operating Agreement have caused, and will cause, irreparable harm to SBA for which there is no adequate monetary compensation. Accordingly, injunctive relief is appropriate.

69. Section 12.18 of the Operating Agreement provides, in relevant part: "[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly SBA is entitled to recover the attorneys' fees and costs and other expenses incurred in connection with this dispute.

**FOURTH CAUSE OF ACTION**

**(Violation of California Penal Code Section 502)**

70. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

71. California Penal Code Section 502 provides for the imposition of criminal fines and/or imprisonment against any person who commits, among other things, the following acts:

A. "[k]nowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to (A) devise or execute any scheme or artifice to defraud, deceive or extort, or (B) wrongfully control or obtain money, property or data"; or

B. "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network"; or

C. "[k]nowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation" of Section 502; or

D. "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

72. In addition to imposing criminal penalties, Section 502(e)(1) permits the "owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss" by reason of any violation of Section 502 to bring a civil action for compensatory damages, injunctive relief or other equitable relief. Section 502(e)(2) further permits the Court in such a civil action to award reasonable attorney's fees.

73. At all times relevant herein, Mr. Biondo owned computers, computer systems, and data.

74. Counter-Claimants are informed and believe that Mr. Brown knowingly, willfully, and unlawfully accessed, or caused to be accessed, computers, computer systems, and/or data owned by Mr. Biondo, and thereby took, copied or otherwise unlawfully used the data contained in said computers and computer systems.

75. Counter-Claimants are further informed and believe that Mr. Brown did so knowingly, without Mr. Biondo's permission, and with the intent to, among other things, (i) wrongfully control or obtain data; and (ii) wrongfully copy and use the computer data for the benefit of Counter-Defendants.

76. Mr. Biondo has been damaged as a result of Mr. Brown's violations of Penal Code Section 502, in an amount to be proven at trial.

77. The violations described above threaten to and will cause great and irreparable injury to Mr. Biondo in that, on information and belief, Mr. Brown has copied and accessed the computer files of Mr. Biondo for purposes of benefiting the competing and unauthorized business ventures of Mr. Brown and prejudicing Mr. Biondo and SBA's rights. The damages that have been, and will be, sustained by Mr. Biondo cannot readily be ascertained or calculated and, therefore, immediate injunctive relief is warranted.

78. Counter-Claimants are informed and believe that Mr. Brown's conduct was willful. Therefore, under Penal Code Section 502(e)(4), Mr. Biondo is entitled to an award of punitive or exemplary damages.

79. In addition, under Penal Code Section 502(e)(2), Mr. Biondo is entitled to an award of his reasonable attorneys' fees and costs incurred in pursuing this cause of action against Mr. Brown.

**FIFTH CAUSE OF ACTION**

**(Violation Of The Federal Computer Fraud And Abuse Act, 18 U.S.C. § 1030 *et seq.*)**

80. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

81. Federal law, like California law, makes it a criminal offense for individuals, including employees, to steal computer information. One such federal statute is the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA").

82. Mr. Biondo owns protected computers and email accounts in which he maintains information, including trade secrets. Mr. Biondo's computers and email accounts are used in interstate commerce.

83. Counter-Claimants are informed and believe that Mr. Brown knowingly and intentionally, and without authorization, accessed Mr. Biondo's email account and that his purpose in doing so was to obtain information, including trade secrets and privileged communications between Mr. Biondo and his counsel, for use in

connection with Mr. Brown's and the other Counter-Defendants' competing and unauthorized business ventures.

84. Counter-Claimants are further informed and believe that, in accessing Mr. Biondo's email account, and forwarding the confidential emails contained therein to himself, Mr. Brown intended to defraud Mr. Biondo and furthered the intended fraud relating to Mr. Brown's false representations to Mr. Biondo that all of the intellectual property and assets developed by and/or at the direction of Mr. Biondo would belong to CFG.

85. Counter-Claimants are informed and believe that Mr. Brown's conduct was intended for private financial gain in that the goal of his fraud and hacking of Mr. Biondo's email account was to further his efforts to secure ownership of CFG's assets and intellectual property for himself and for the entities he controls, including, without limitation, Counter-Defendant Onyx.

86. Mr. Brown's access of Mr. Biondo's email account has caused loss and/or damage to Mr. Biondo of at least $5,000, including but not limited to costs incurred in investigating and responding to Mr. Brown's unlawful conduct and other consequential damages.

87. Although the CFAA is a criminal statute, Mr. Biondo may maintain a civil action against Mr. Brown for damages, injunctive relief, and other equitable relief, under 18 U.S.C. § 1030(g).

88. Mr. Brown's conduct has caused, and will continue to cause, irreparable injury to Mr. Biondo for which Mr. Biondo has no adequate remedy at law. Therefore, injunctive relief is appropriate.

## SIXTH CAUSE OF ACTION

## (Fraud)

89. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

90. Beginning in the middle of 2012, and continuing through 2013, Mr.

Brown made multiple representations to Counter-Claimants that the work performed by Mr. Biondo, including the substantial work product, intellectual property and assets that he created, for the contemplated Charter Flight Group business venture and, after the organization of CFG, for CFG, would inure to the benefit of, and belong solely to, CFG. Mr. Brown further represented that any assets obtained by virtue of his capital contributions to the business venture would also inure to the benefit of, and belong solely to, CFG.

91. Counter-Claimants are informed and believe that, at the time Mr. Brown made these representations, such representations were false and that Mr. Brown knew them to be false.

92. Counter-Claimants are informed and believe that, in making these misrepresentations, Mr. Brown intended to induce Counter-Claimants to expend substantial time and resources developing the business of CFG so that Mr. Brown could later claim that the assets developed by, or at the direction of, Mr. Biondo actually belonged to Mr. Brown, Onyx and other entities controlled by Mr. Brown.

93. Counter-Claimants reasonably relied on Mr. Brown's misrepresentations by, among other things, expending substantial time and resources developing the business of CFG for little or no monetary compensation, under the belief that his work would inure to the benefit of, and belong to, CFG, an entity in which SBA would hold a 50% interest.

94. As a direct and proximate result of Mr. Brown's fraudulent misconduct, Counter-Claimants have suffered actual damages in an amount to be proven at trial.

95. In engaging in the above-alleged fraud, Mr. Brown engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of SBA, and in engaging the acts or omissions alleged herein, was guilty of fraud, oppression and malice. Accordingly, Counter-Claimants seek punitive and exemplary damages in an amount according to proof at trial.

96. Section 12.18 of the Operating Agreement provides, in relevant part:

"[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly Counter-Claimants are entitled to recover the attorneys' fees and costs and other expenses incurred in connection with this dispute.

## SEVENTH CAUSE OF ACTION

## (Derivative Claim on Behalf of CFG for Conversion)

97. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

98. CFG owned, possessed and/or had a right to possess personal property consisting of assets and intellectual property rights in, among other things, the CFG website and the CFG domain name.

99. Counter-Claimants are informed and believe that Counter-Defendants intentionally and substantially interfered with CFG's above-alleged property by, among other things, taking possession of that property and preventing CFG from having access to that property.

100. CFG did not consent to Counter-Defendants' intentional and substantial interference with CFG's property.

101. As a direct and proximate result of Counter-Defendants' misconduct, CFG has been harmed and Counter-Defendants' misconduct was a substantial factor in causing harm to CFG.

102. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG.

103. Accordingly, SBA, on behalf of CFG, seeks damages in an amount to be proved at trial, along with injunctive relief ordering Counter-Defendants to immediately return and cease any further claim of ownership of CFG's property.

104. In engaging in the above-alleged misconduct, Counter-Defendants engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of CFG, and in engaging the acts or omissions alleged herein, were guilty of oppression and malice. Accordingly, SBA, on behalf of CFG, seeks punitive and exemplary damages in an amount according to proof at trial.

105. CFG owns and/or is interested in the property and assets of CFG, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property. Counter-Claimants are informed and believe that Counter-Defendants have wrongfully acquired, attempted to acquire, and/or claimed an ownership interest in, some or all of the foregoing property and assets of CFG. Accordingly, a constructive trust should be imposed over the property and assets of CFG with respect to which Counter-Defendants have claimed title, possession, and/or ownership, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property, and Counter-Defendants, and any other persons or entities who possess said property and assets should be treated as involuntary trustees of said property and assets for the benefit of CFG.

106. Section 12.18 of the Operating Agreement provides, in relevant part: "[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly SBA, suing on behalf of CFG, is entitled to recover the attorneys' fees and costs and other expenses incurred in connection with this dispute.

/ / /

/ / /

/ / /

## EIGHTH CAUSE OF ACTION

## (Derivative Claim On Behalf Of CFG For Intentional Interference With Contract)

107. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

108. CFG had valid and existing contractual relationships with the contractors hired to perform work on its behalf and with its customers.

109. Onyx and Jet Genius were at all times aware of these contractual relationships.

110. The above-averred conduct of Onyx and Jet Genius prevented performance or made performance of those contracts more expensive or difficult.

111. Onyx and Jet Genius intended to disrupt the performance of those contracts and/or knew that disruption of their performance was substantially certain to occur.

112. As a direct and proximate result of Onyx and Jet Genius' interference, CFG was harmed and Onyx and Jet Genius' misconduct was a substantial factor in causing harm to CFG.

113. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG.

114. Accordingly, SBA, on behalf of CFG, seeks damages in an amount to be proven at trial, along with injunctive relief ordering Onyx and Jet Genius to immediately cease any further interference with CFG's contractual relationships.

115. In addition, CFG owns and/or is interested in the property and assets of CFG, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property. Counter-Claimants are informed and believe that Onyx and Jet Genius have wrongfully acquired, attempted to acquire, and/or claimed an ownership interest in, some or all of the foregoing property and assets of CFG. Accordingly, a constructive trust

should be imposed over the property and assets of CFG with respect to which Onyx and Jet Genius have claimed title, possession, and/or ownership, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property, and Onyx and Jet Genius, and any other persons or entities who possess said property and assets should be treated as involuntary trustees of said property and assets for the benefit of CFG.

116. In engaging in the above-alleged misconduct, Onyx and Jet Genius engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of CFG, and in engaging the acts or omissions alleged herein, were guilty of oppression and malice. Accordingly, SBA, on behalf of CFG, seeks punitive and exemplary damages in an amount according to proof at trial.

## NINTH CAUSE OF ACTION

### (Derivative Claim On Behalf Of CFG Intentional Interference With Prospective Economic Advantage)

117. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

118. CFG was engaged in various economic relationships with customers and potential customers seeking aviation charter services, and with contractors providing services for CFG. These economic relationships probably would have resulted in an economic benefit to CFG.

119. Counter-Claimants are informed and believe that Onyx and Jet Genius were at all times aware of such relationships.

120. Counter-Claimants are informed and believe that Onyx and Jet Genius engaged in, among other things, the conversion of CFG's assets, including the intellectual property associated with its website and domain name.

121. Counter-Claimants are informed and believe that, in engaging in the above-averred misconduct, Onyx and Jet Genius intended to disrupt CFG's economic relationships and/or knew that disruption of such relationships was certain

or substantially certain to occur.

122. Such conduct disrupted CFG's relationships with its customers, potential customers, and contractors. Moreover, Onyx and Jet Genius' conduct was independently wrongful, over and above the fact of the interference itself, in that it constituted, among other things, the conversion of CFG's assets.

123. As a direct and proximate result of Onyx and Jet Genius' misconduct, CFG was harmed, and Onyx and Jet Genius' misconduct was a substantial factor in causing that harm.

124. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG.

125. Accordingly, SBA, on behalf of CFG, seeks damages in an amount to be proven at trial, along with injunctive relief preventing further interference with CFG's economic relationships.

126. In addition, CFG owns and/or is interested in the property and assets of CFG, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property. Counter-Claimants are informed and believe that Onyx and Jet Genius have wrongfully acquired, attempted to acquire, and/or claimed an ownership interest in, some or all of the foregoing property and assets of CFG. Accordingly, a constructive trust should be imposed over the property and assets of CFG with respect to which Onyx and Jet Genius have claimed title, possession, and/or ownership, including without limitation the www.charterflightgroup.com domain name, the Charter Flight Group website, and associated intellectual property, and Onyx and Jet Genius, and any other persons or entities who possess said property and assets should be treated as involuntary trustees of said property and assets for the benefit of CFG.

127. In engaging in the above-alleged misconduct, Onyx and Jet Genius engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of CFG, and in engaging the acts or omissions alleged herein,

were guilty of oppression and malice. Accordingly, SBA, on behalf of CFG, seeks punitive and exemplary damages in an amount according to proof at trial.

**TENTH CAUSE OF ACTION**

**(Direct Claim On Behalf Of Mr. Biondo And SBA For Intentional Interference With Prospective Economic Advantage)**

128. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

129. Mr. Biondo and SBA were engaged in various economic relationships with customers and potential customers seeking aviation charter services, with contractors providing services for CFG, and with CFG itself. These economic relationships would probably have resulted in an economic benefit to Mr. Biondo and SBA.

130. Counter-Claimants are informed and believe that Onyx and Jet Genius were at all times aware of such relationships.

131. Counter-Claimants are informed and believe that Onyx and Jet Genius engaged in, among other things, the conversion of CFG's assets, including the intellectual property associated with its website and domain name, efforts to force a sale of SBA's interest in CFG for little or no consideration, and efforts to squeeze Mr. Biondo out of CFG's business.

132. Counter-Claimants are informed and believe that, in engaging in the above-averred misconduct, Onyx and Jet Genius intended to disrupt Mr. Biondo and SBA's economic relationships and/or knew that disruption of such relationships was certain or substantially certain to occur.

133. Such conduct disrupted Mr. Biondo and SBA's relationships with customers and potential customers seeking aviation charter services, with contractors providing services for CFG, and with CFG itself. Moreover, Onyx and Jet Genius' conduct was independently wrongful, over and above the fact of the interference itself, in that it constituted, among other things, the conversion of

CFG's assets, and the participation in Mr. Brown, Mr. Stanz, and Bowman's breaches of fiduciary duties to SBA and Mr. Biondo.

134. As a direct and proximate result of Onyx and Jet Genius' misconduct, Mr. Biondo and SBA were harmed, and Onyx and Jet Genius' misconduct was a substantial factor in causing that harm.

135. Accordingly, Mr. Biondo and SBA seek damages in an amount to be proven at trial, along with injunctive relief preventing further interference with their economic relationships.

136. In engaging in the above-alleged misconduct, Onyx and Jet Genius engaged in despicable conduct and acted with willful, reckless and conscious disregard of the rights of Mr. Biondo and SBA, and in engaging the acts or omissions alleged herein, were guilty of oppression and malice. Accordingly, Mr. Biondo and SBA seek punitive and exemplary damages in an amount according to proof at trial.

## ELEVENTH CAUSE OF ACTION

**(Derivative Claim on Behalf of CFG And Direct Claim On Behalf Of SBA And Mr. Biondo for Unfair Competition Under Business & Professions Code § 17200 *et seq.*)**

137. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

138. As alleged in this Counterclaim, Counter-Defendants have engaged in conduct that constitutes unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200 *et seq*.

139. All Counter-Defendants have taken the actions alleged in this Counterclaim with the intent to injure CFG and to gain an unfair competitive advantage in the marketplace.

140. As a direct and proximate result of Counter-Defendants' unlawful conduct, CFG, SBA, and Mr. Biondo have suffered, and will continue to suffer,

substantial actual losses for which they are entitled to restitution from Counter-Defendants.

141. SBA, as a member of CFG, has standing to sue derivatively on behalf of CFG.

142. Unless enjoined by the Court, Counter-Defendants will continue to engage in the acts, conduct and omissions set forth above, which have resulted, and will continue to result in, irreparable injury to Mr. Biondo, SBA, and CFG. Mr. Biondo, SBA, and CFG have no adequate remedy at law for such acts and threatened acts. Therefore, Mr. Biondo, SBA, and CFG request, pursuant to California Business & Professions Code § 17203, that during the pendency of this action, the Court issue a preliminary injunction, and that after trial, the Court issue a permanent injunction, restraining and enjoining Counter-Defendants and their agents, employees, attorneys and representatives, and anyone acting at their direction or on their behalf, from engaging in further conduct constituting unfair competition.

143. Section 12.18 of the Operating Agreement provides, in relevant part: "[i]n the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses." Accordingly SBA, suing on behalf of CFG, is entitled to recover the attorneys' fees and costs and other expenses incurred in connection with this dispute.

**TWELFTH CAUSE OF ACTION**

**(Accounting)**

144. Counter-Claimants reallege and incorporate herein by this reference each and every allegation contained in the above paragraphs of this Counterclaim.

145. SBA is a member of CFG. Bowman and Mr. Stanz, as members of

CFG, and Mr. Brown, as a manager of CFG, have a fiduciary obligation to CFG and to SBA to allow for a full accounting of the money and property of CFG.

146. Differences have arisen between the members of CFG such that the financial condition of CFG is unknown, unstated, and it is necessary for the parties to resolve such differences.

147. SBA, as a member, seeks an accounting of CFG to determine, among other things, the extent of the misappropriation of CFG's assets.

148. Accordingly, SBA is entitled to a Court order for an accounting by a qualified forensic accountant.

**WHEREFORE**, Counter-Claimants pray for judgment on their Counterclaim as follows:

A. For damages in an amount to be determined at trial;

B. For punitive damages in an amount to be determined at trial;

C. For the appointment of a receiver for CFG;

D. For preliminary and permanent injunctions on the grounds alleged above;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

E. For the imposition of a constructive trust on the assets and property of CFG with respect to which Counter-Defendants have claimed title, possession, and/or ownership such that Counter-Defendants are the involuntary trustees of such assets and property for the benefit of CFG;

F. For attorney's fees incurred herein;

G. For costs of suit incurred herein;

H. For such other and further relief as the Court deems just and proper.

Dated: June 17, 2014

RUTAN & TUCKER, LLP
STEVEN A. NICHOLS
GEORGE GORMAN

By: /s/ George Gorman

George Gorman
Attorneys for Defendant and Counter-Claimant SB Aviation, Inc. and Counter-Claimant Scott Biondo

## REQUEST FOR JURY TRIAL

Defendant and Counter-Claimant SB Aviation, Inc. and Counter-Claimant Scott Biondo hereby request a trial by jury.

Dated: June 17, 2014

RUTAN & TUCKER, LLP
STEVEN A. NICHOLS
GEORGE GORMAN

By: /s/
George Gorman
Attorneys for Defendant and Counter-Claimant SB Aviation, Inc. and Counter-Claimant Scott Biondo

# OPERATING AGREEMENT
# FOR
# CHARTER FLIGHT GROUP, LLC
# A CALIFORNIA LIMITED LIABILITY COMPANY

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

(

OPERATING AGREEMENT
FOR
CHARTER FLIGHT GROUP, LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement, made as of January 31, 2013, by and among the parties listed on the signature pages hereof, with reference to the following facts:

A. On December 26, 2012, Articles of Organization for Charter Flight Group, LLC (the "Company"), a limited liability company under the laws of the State of California, were filed with the California Secretary of State.

B. The parties desire to adopt and approve an operating agreement for the Company.

C. This agreement shall become binding and effective as of the date it is signed, but may be subject to further revisions and amendments with unanimous vote of the then existing members pursuant to the provisions of Article IV, Section 4.8, subd. A, (iii), and therefore may be superceded by a revised Operating Agreement sometime subsequent to the filing of the Statement of Information (Form LLC-12) of the Company with the California Secretary of State.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the "Members," or individually by "Member") by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

ARTICLE I
DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1 "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

1.2 "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Members. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other

entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3 "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.4 "Articles" shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.5 "Bankruptcy" shall mean: (a) the filing of an application by any Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court.

1.6 "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7 "Capital Contribution" shall mean the total value of cash and fair market value of property (including promissory notes or other obligation to contribute cash or property) contributed and/or services rendered or to be rendered to the Company by Members.

1.8 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.9 "Company" shall mean Charter Flight Group, LLC, a California limited liability company.

1.10 "Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).

1.11 "Corporations Code" shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12 "Dissolution Event" shall mean with respect to any Member one or more of the following: the death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of any other event which terminates the continued membership

of any Member unless the other Members' consent to continue the business of the Company pursuant to Article VIII.

1.13 "Distributable Cash" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Managers deem necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14 "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and/or distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15 "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.16 "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

1.17 "Former Member" shall have the meaning ascribed to it in Section 8.1.

1.18 "Former Member's Interest" shall have the meaning ascribed to it in Section 8.1.

1.19 "Majority Interest" shall mean one or more Percentage Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

1.20 "Member" shall mean each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles or this Agreement or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

1.21 Manager" shall mean one or more Managers. "Manager" shall also mean those persons with authority to act on behalf of the Company, including but not limited to, entering into contracts on behalf of the Company. A Manager is not required to be a Member of the Company.

1.22 "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.23 "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24 "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

1.25 "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

1.26 "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27 "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement. Percentage Interests shall be determined annually, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's Fiscal Year but with all distributions under this Agreement to be deemed to have occurred on such day immediately prior to determination of the Percentage Interest of a Member.

1.28 "Person" shall mean an individual, general partnership, limited partnership, limited liabilitycompany, corporation, trust, estate, real estate investment trust, association or any other entity.

1.29 "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30 "Remaining Members" shall have the meaning ascribed to it in Section 8.1.

1.31 "Tax Matters Partner" shall be**.

ARTICLE II
ORGANIZATIONAL MATTERS

2.1 Formation. Pursuant to the Act, the Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2 Name. The name of the Company shall be "Charter Flight Group, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers of the Company deem appropriate or advisable. The Managers shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider appropriate or advisable.

2.3 Term. The term of this Agreement shall be co-terminus with the period of duration of the Company provided in the articles, unless extended or sooner terminated as hereinafter provided.

2.4 Required Maintenance of Registered Office and Agent in California. The Company shall have an agent for service of process in California who may be either a natural person or a corporation meeting the qualifications of Corporations Code Section 17061(d)(1) and Section 17050(a)(5). Every agent for service of process must have a street address for the receipt of service of process. The street address of the agent for receipt of service of process is the registered office of the limited liability company in California. Within 30 days after changing the location of his office from one address to another in California, an agent for service of process must file a certificate with the Secretary of State setting forth the names of the limited liability companies represented by him/her, the address at which he, she, or it has maintained the office for each of the limited liability companies, and the new address to which the office is transferred.

2.5 Addresses of the Members and the Managers. The respective addresses of the Members and the Managers are set forth on Exhibit A hereto.

2.6 Purpose of Company. The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act. Notwithstanding the foregoing, without the consent of the Members, the Company shall engage in the business of **, or any of the following:

(a) the purchase of any real or personal property, make any investment, and engage in any joint venture, general partnership, limited partnership, or other business activity proposed by the Members and/or Managers and not prohibited by law or this Agreement; or

(b) such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Members and/or Managers (if applicable) to further the foregoing business.

2.7 Use of Full Legal Name of Company Required. All business of the Company shall be conducted under the name Charter Flight Group, LLC until such time as Members shall designate otherwise and file amendments to the Articles in accordance with the Articles and the Act. The phrase "LLC" shall always appear as part of the name of the Company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.8 Required Maintenance of Records in California Office. The Company shall continuously maintain an office in the State of California which may but need not be a place of its business in this state or its registered office, at which it shall keep:

(a) A current list of the full name and last known business address of each Member and of each holder of an Economic Interest in alphabetical order together with the Capital Contribution and Percentage Share in net profits and net losses;

(b) A copy of the filed Articles and all amendments thereto, together with any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) Copies of the Company's federal, state and local income tax returns or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of the Agreement and any amendments thereto, together with any powers of attorney pursuant to which any written operating agreement or amendments were executed;

(e) Copies of financial statements of the Company for the six (6) most recent taxable years; and

(f) The above described records are subject to inspection and copying at the reasonable request, and at the expense, of any member during ordinary business hours.

2.9 Other Formation Matters.

A. Maintenance of Company Record Book

Members shall authorize the maintenance of a Company Record Book to include the Articles, the Agreement and any amendments thereto and the minutes

of meetings (or consents in lieu of meetings) of Members and other important documents of Company.

B. Certificate of Manager of Limited Liability Company

Members may authorize the preparation of a certificate of Manager of Limited Liability Company setting forth the full legal name of Company, date of organization, the laws of organization, term of existence, good standing status as of the date of the certificate, name of manager, general description of authority of manager, taxpayer identification number with attachment of Article III, as it may have been amended to date of this Agreement, setting forth the management and control of the operations of Company. Managers are not required to be a member of the Company.

ARTICLE III
CAPITAL CONTRIBUTIONS

3.1 Initial Capital Contributions. Each Member shall contribute such amount or service to be provided to the Company and value therefore as is set forth on Exhibit A hereto as his, her, or its initial Capital Contribution.

3.2 Additional Capital Contributions. No Member shall be required to make any additional Capital Contributions. To the extent unanimously approved by the Managers and Members who hold a Majority Interest, whether individually or through proxy, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, including without limitation, expansion or diversification. In that event, the Members shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their Percentage Interests. Immediately following such Capital Contributions, the Percentage Interests shall be adjusted by the Managers to reflect the new relative proportions of the Capital Accounts of the Members.

3.3 Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his or her Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4 No Interest. No Member shall be entitled to receive any interest on his or her Capital Contributions.

ARTICLE IV
MEMBERS

4.1 Limitations on Liability of Members for Debts of Company. Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, her, or its capital account, nor shall any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

4.2 Admission of Additional Members. The Managers, with the approval of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Managers and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

4.3 Withdrawals or Resignations. Any Member who is under an obligation to render services to the Company may withdraw or resign as a Member at any time upon 120 days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. Such Member's Membership Interest shall be subject to purchase and sale as provided in Section 8.2. No other Member may withdraw or resign from the Company.

4.4 Termination of Membership Interest. Upon the transfer of a Member's Membership Interest in violation of this Agreement, the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company or the withdrawal of a Member in accordance with Section 4.3, the Membership Interest of a Member shall be terminated by the Managers or such Membership Interest shall be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.5 Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior approval of the Managers after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.6 Remuneration to Members. Except as otherwise authorized in, or pursuant to, this Agreement, no Member is entitled to remuneration for acting in the Company business, subject to the entitlement of Managers or Members winding up the affairs of the Company to reasonable compensation pursuant to Section 10.3.

4.7 Members Are Not Agents. Pursuant to Section 5.1 and the Articles, the management of the Company is vested in the Managers who will be determined at a date following the execution of this Agreement. No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.8 Voting Rights. Except as expressly provided to the contrary in this Agreement or the Articles, Members shall have voting, approval or consent rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A. Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest.

(i) A decision to continue the business of the Company after the occurrence of a Dissolution Event.

(ii) Except as provided in Section 7.4, the transfer of a Membership Interest and admission of the assignee as a Member of the Company.

(iii) Any amendment of the Articles or this Agreement.

(iv) A decision to compromise the obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

B. Approval by Members Holding a Majority Interest. Except as set forth in Section 4.8A in all other matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act.

C. Other Voting Rights. Besides the rights granted in Section 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i) Section 3.2 on additional Capital Contributions;

(ii) Section 3.5 on remedies for a Member's failure to make a contribution;

(iii) Section 4.2 on admission of new Members;

(iv) Section 5.2 on election and removal of a Manager;

(v) Section 5.3B on a change in the purpose of the Company;

(vi) Section 5.3B on reorganization of the Company;

(vii) Section 5.3B on other limitations on the Managers' authority;

(viii) Section 5.8 on transactions with the Managers and Affiliates of the Managers;

(ix) Section 5.10A on management fees payable to Managers; and

(x) Section 10.1 on dissolving the Company.

4.9 Meetings of Members.

A. Date, Time and Place of Meetings of Members: Secretary. Meetings of Members may be held at such date, time and place within or without the State of California as the Managers may fix from time to time, or if there are two or more Managers and they are unable to agree to such time and place, Members holding a Majority Interest shall determine the time and place.

B. Notice of Meeting. Written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting.

C. Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

4.10 Liability of Members to Company.

A. Liability of Members to Company

A Member is liable to Company: *(i)* for the difference between his, her, or its contribution to capital as actually made and that stated in the Articles, the Agreement, subscription for contribution or other document executed by the Member as

having been made by the Member; and *(ii)* for any unpaid contribution to capital which he, she or it agreed in the Articles, the Agreement or other document executed by the Member to make in the future at the time and on the conditions stated in the Articles of Organization, Operating Agreement or other document evidencing such agreement. No Member shall be excused from an obligation to Company to perform any promise to contribute money, property or to perform services because of death, disability, dissolution or any other reason.

ARTICLE V
MANAGEMENT AND CONTROL OF THE COMPANY

5.1 Management of the Company by Managers.

A. Exclusive Management by Managers. The business, property and affairs of the Company shall be managed exclusively by the Managers. Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

B. Agency Authority of Managers. Subject to Section 5.3B: Any Manager, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. All checks, drafts, and other instruments obligating the Company to pay money in an amount of less than $5,000.00 may be signed by any one Manager, acting alone. All checks, drafts, and other instruments obligating the Company to pay money in an amount of $5,000.01 or more must be signed on behalf of the Company by any ***two*** Managers acting together.

C. Meetings of Managers. Meetings of the Managers may be called by any Manager or by the chairperson, president, any vice-president or the secretary. All meetings shall be held upon four (4) days notice by mail or forty-eight (48) hours notice delivered personally or by telephone, telegraph or facsimile. A notice need not specify the purpose of any meeting.

5.2 Election of Managers.

A. Number, Term and Qualification. The Company shall initially have at least two Managers, namely, Jordan Brown and Scott Biondo. Managers of the Company shall be fixed from time to time by the affirmative vote or written consent of Members holding a Majority Interest, either individually or by proxy, provided that in no instance shall there be less than one Manager and provided further that if the number of Managers is reduced from more than one to one, the Articles shall be amended to so state,

and if the number of Managers is increased to more than one, the Articles shall be amended to delete the statement that the Company has only one Manager. Unless he or she resigns or is removed, each Manager shall hold office until a successor shall have been elected and qualified. Managers shall be elected by the affirmative vote or written consent of Members holding a Majority Interest.

B. Resignation. Any Manager may resign at any time by giving written notice to the Members and remaining Managers without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

C. Removal. All or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Members holding a Majority Interest at a meeting called expressly for that purpose, or by the written consent of the Members holding a Majority Interest. Any removal shall be without prejudice to the rights, if any, of the Manager under any employment contract.

A Manager also may be removed by the affirmative vote or written consent of a majority of the remaining Managers if such Manager becomes incapable of fulfilling his or her obligations under this Agreement because of injury or physical or mental illness and such incapacity shall exist for thirty (30) working days in the aggregate during any consecutive six (6) month period.

5.3 Powers of Managers.

A. Powers of Managers. Without limiting the generality of Section 5.1, but subject to Section 5.3B and to the express limitations set forth elsewhere in this Agreement, the Managers shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

B. Limitations on Power of Managers. Notwithstanding any other provisions of this Agreement, no debt or liability of more than $5,000.00 may be contracted on behalf of the Company except by the written consent of all Managers. Additionally, the Managers shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest (or such greater Percentage Interests set forth below) of the Members:

(i) The merger of the Company with a corporation or a general partnership or other Person shall require the affirmative vote or written consent of all Members.

(ii) The establishment of different classes of Members.

(iii) An alteration of the primary purpose of the Company as set forth in Section 2.3.

(iv) Transactions between the Company and one or more of the Managers or one or more of any Manager's Affiliates, or transactions in which one or more Managers, or one or more of any Manager's Affiliates, has a material financial interest.

(v) Without limiting subsection (vi), the lending of money by the Company to any Manager, Member, or officer.

(vi) Any act which would make it impossible to carry on the ordinary business of the Company.

(vii) The confession of a judgment against the Company.

(viii) Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

5.4 Members Have No Managerial Authority. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. Unless expressly and duly authorized in writing to do so by a Manager, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5 Performance of Duties; Liability of Managers. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Managers shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

The duties of the Managers shall include, but are not limited to, the following assignments of responsibility:

To be determined by the affirmative vote of Members holding a Majority Interest at a meeting called expressly for that purpose.

In performing their duties, the Managers shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Managers act in good faith and after reasonable inquiry when the need is indicated by the circumstances:

(a) one or more officers, employees or other agents of the Company whom the Managers reasonably believe to be reliable and competent in the matters presented;

(b) any attorney, independent accountant, or other person as to matters which the Managers reasonably believe to be within such person's professional or expert competence; or

(c) a committee upon which the Managers do not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Managers reasonably believe to merit competence.

5.6 Devotion of Time. The Managers are not obligated to devote all of their time or business efforts to the affairs of the Company. The Managers shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

5.7 Competing Activities. The Managers and their officers, directors, shareholders, partners, members, agents, employees and Affiliates may not engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. The Managers shall be obligated to present any investment opportunity or prospective economic advantage to the Company, if the opportunity is of the character that, if presented to the Company, could be taken by the Company.

5.8 Payments to Managers. Except as specified in this Agreement, no Manager or Affiliate of a Manager is entitled to remuneration for services rendered or goodwill provided to the Company. The Managers shall be compensated subject to discussion and resolution at the 1st meeting of the Members, and in accordance with the guidelines set forth in Attachment B hereto.

A. Management Fee. The Company may pay the Managers a monthly fee for services in connection with the management of the Company as hereinafter determined. Such fee may be changed from time to time only by an affirmative vote of Members holding at least a Majority Interest, individually or by proxy, and no Manager shall be prevented from receiving any fee because the Manager is also a Member of the Company.

B. Expenses. The Company shall reimburse the Managers and their affiliates for the actual cost of goods and materials used for or by the Company. The company shall also pay or reimburse the Managers or their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

5.9 Acts of Managers as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by at least two Managers (or by one Manager if the Articles state that the Company is managed by only one Manager), is not invalidated as to the Company by any lack of authority of the signing Managers in the absence of actual knowledge on the part of the other person that the signing Managers had no authority to execute the same.

5.10 Limited Liability. No person who is a Manager or officer or both a Manager and officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer or both a Manager and officer of the Company.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1 Allocations of Net Profit and Net Loss.

A. Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.1A). Any loss reallocated under this Section 6.1A shall be taken into account in computing subsequent allocation of income and losses pursuant to this Article VI, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article VI, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI if no reallocation of losses had occurred under this Section 6.1A.

B. Net Profit. Net Profit shall be allocated to the Members in proportion to their Percentage Interests.

6.2 Special Allocations.

A. Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B. Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C. Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D. Member Nonrecourse Deductions. Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period

shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E. Qualified Income Offset. Notwithstanding Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

6.3 Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.4 Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, of decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the

month). Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5 Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Managers may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

(a) To the Members in proportion to their unreturned Capital Contributions until each Member has recovered his or her Capital Contributions; and

(b) To the Members in proportion to their Percentage Interests.

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 6.5.

6.6 Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon dissolution and the winding up of the Company's affairs, no Member may be compelled to accept a distribution of any asset in kind.

6.7 Restriction on Distributions.

A. No distribution shall be made if, after giving effect to the distribution:

(i) The Company would not be able to pay its debts as they become due in the usual course of business.

(ii) The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B. The Managers may base a determination that a distribution is not prohibited on any of the following:

(i) Financial statements prepared on the basis of accounting practices and principles (GAAP principles exclusively) that are reasonable in the circumstances.

(ii) A fair valuation.

(iii) Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days of the date of authorization.

C. A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8 Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9 Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

6.10 Distributions of Net Cash Flow by Company. Subject to any limitations found elsewhere in the Agreement and under law including the requirements of Section 17254 of the Act that the assets of Company after the distribution be in excess of all liabilities except for liabilities owed to Members for their Capital Contributions, Members acting as Managers may, but are not required to do so, distribute any Net Cash Flow as defined below among Members in accordance with their respective Percentage Interest in Net Profits set forth in Exhibit B, but only to those persons or entities recognized on the books of Company as Members or as assignees of interests on the day of the distribution. With respect to any fiscal period, Net Cash Flow means all cash

revenues of Company during that period (including interest or other earnings on the funds of Company), less the sum of reserves for the following amounts:

(i) All payments of principal and interest on any indebtedness of Company;

(ii) All payments for carrying costs or operating costs incurred incident to the operation of the business of Company and in accordance with the terms of the Agreement; and

(iii) Reasonable working capital funds for contingencies incident to the conduct of the business of Company.

ARTICLE VII
TRANSFER AND ASSIGNMENT OF INTERESTS

7.1 Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest except with the prior written consent of all of the other Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the other Members may determine in their sole discretion. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2 Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest: (i) without compliance with Section 12.10, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Managers.

7.3 Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members as required by Section 7.1, upon consent of the Managers, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.4 Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

7.5 No Effect to Transfers in Violation of Agreement. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Managers, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Managers, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100.00, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right to the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof.

7.6 Right of First Refusal. Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to

the Company and the non-transferring Members in accordance with the following provisions:

A. Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the name and address of the proposed transferee, (iii) the Membership Interest to be transferred, and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B. Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Managers in writing of his or her desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his or her pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

C. Within ninety (90) days after receipt of the notice described in Section 7.8A the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers.

D. If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within sixty (60) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

ARTICLE VIII
CONSEQUENCES OF DEATH, DISSOLUTION,
RETIREMENT OR BANKRUPTCY OF MEMBER

8.1 Dissolution Event. Upon the occurrence of a Dissolution Event, the Company shall dissolve unless the remaining Members ("Remaining Members") holding all of the remaining Membership Interests consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company. If the Remaining Members consent to the continuation of the business of the Company, the Company and/or the Remaining Members shall purchase, and the Member whose actions or conduct resulted in the Dissolution Event ("Former Member") or such Former Member's legal representative shall sell, the Former Member's Membership Interest ("Former Member's Interest") as provided in this Article VIII to avoid dissolution of the Company.

8.2 Withdrawal. Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.4 will such Member be treated as a Former Member, and will the Company and/or the Remaining Members be obligated to purchase, and will the Former Member be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3 Purchase Price. The purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 3.3; provided, however, that if the Former Member, such Former Member's legal representative or the Company, deems the Capital Account balance to vary from the fair market value of the Former Member's Interest by more than ten percent (10%), such party shall be entitled to require an appraisal by providing notice of the request for appraisal within fifteen (15) days after the determination of the Remaining Members to continue the business of the Company. In such event, the value of the Former Member's Interest shall be determined by three (3) independent appraisers, one selected by the Former Member or such Former Member's legal representative, one selected by the Company, and one selected by the two appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two appraisals closest in amount to each other. In the event the fair market value is determined to vary from the Capital Account balance by less than ten percent (10%), the party requesting such appraisal shall pay all expense of all the appraisals incurred by the party offering to enter into the transaction at the Capital Account valuation. In all other events, the party requesting the appraisal shall pay one-half of such expense and the other party shall pay one-half of such expense. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4 Notice of Intent to Purchase. Within thirty (30) days after the Managers have notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Managers in writing of his or her desire to purchase a portion of the Former

Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5 Election to Purchase Less Than All of the Former Member's Interest. If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire interest of the Former Member, the Company shall purchase any remaining share of the Former Member's Interest.

8.6 Payment of Purchase Price. The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the Remaining Members:

A. The Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Former Member's Interest; or

B. The Company or the Remaining Members shall pay at the closing one-fifth (1/5) of the purchase price in which case the balance of the purchase price shall then be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at the current applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation to pay the balance due shall be evidenced by a promissory note, and if purchased by a Remaining Member, secured by a pledge of the Membership Interest being purchased.

8.7 Closing of Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8 Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

8.9 Noncompetition.

A. Prohibited Activities. If any Member transfers his or her Membership Interest pursuant to either Article VII or VIII, such Member agrees that, for a period of five (5) years from the date of such transfer, he or she shall not:

(i) Enter, directly or indirectly, into the employment of, or render, directly or indirectly, any services (whether as a director, officer, agent, representative, independent contractor, consultant or advisor or any other similar relationship or capacity), to any Person (such person is referred to as a "Competitor") which provides those services, or which otherwise competes with, or carries on a similar business to any business now carried on by the Company in the counties of Orange, Los Angeles, Riverside, San Bernardino and San Diego, California (and all cities located therein) (the "Territory"), whether such business is carried on by the Company or by a successor or assign in any of these counties;

(ii) Engage, directly or indirectly, in any such business in the Territory as a Competitor;

(iii) Become interested, directly or indirectly, in any such Competitor as an individual, proprietor, franchisee, partner, joint venturer, stockholder, principal, member, investor, trustee or any other similar other relationship or capacity;

(iv) Directly or indirectly, by sole action or in concert with others, solicit, induce or influence, or seek to solicit, induce or influence, any Person who is engaged by the Company as an employee, agent, independent contractor or otherwise, to leave the employ of the Company or any successor or assign;

(v) Directly or indirectly, by sole action or in concert with others, solicit, induce or influence, or seek to solicit, induce or influence, any customer or client of the Company during the twelve (12) calendar months immediately preceding the date of transfer of the Membership Interest; and

(vi) Use, divulge, furnish, make accessible to any Person (other than at the written request of the Company) any secret, confidential or proprietary knowledge or information of the Company including, but not limited to, any trade secrets, financial information, customer or client lists, marketing methods, data, properties, specifications, personnel, organization or internal affairs of the Company.

B. Separate Covenants. The agreements contained in Section 8.9A shall be construed as a series of separate covenants, one for each activity of the Member, capacity in which the Member is prohibited from competing and each part of the Territory in which the Company is carrying on in such activity.

C. Intent: Severability. The Members intend that Section 8.9A satisfy the terms of, and be enforceable in accordance with the California Business and Professions Code Section 16602.5, which authorizes any member who sells his or her interest in a limited liability company to enter into an agreement with the buyer of such interest to refrain from carrying on a similar business within the counties or cities in which a limited liability company carries on a like business therein. Each Member recognizes that the territorial and time restrictions set forth herein are reasonable, not burdensome and are properly required by law for the adequate protection of the Company and its Members. If such territorial or time restrictions or any other provision contained herein shall be deemed to be illegal, unenforceable or unreasonable by a court of competent jurisdiction, each Member agrees and submits to the reduction of such territorial or time restriction or other provision to such an area or period as such court shall deem reasonable.

D. Injunctive Relief. Each Member acknowledges that (i) the covenants and the restrictions contained in Section 8.9A are a material factor to such Member's execution of this Agreement and are necessary and required for the protection of the Company, (ii) such covenants relate to matters that are of a special, unique and extraordinary character that gives each of such covenants a special, unique and extraordinary value, and (iii) a breach of any of such covenants will result in irreparable harm and damages to the Company in an amount difficult to ascertain and which cannot be adequately compensated by a monetary award. Accordingly, in addition to any of the relief to which the Company may be entitled at law or in equity, the Company shall be entitled to temporary and/or permanent injunctive relief from any breach or threatened breach by a Member of the provisions of Section 8.9A without proof of actual damages that have been or may be caused to the Company by such breach or threatened breach.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1 Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with Generally Accepted Accounting Principles (GAAP). The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A. A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B. A current list of the full name and business or resident address of each Manager;

C. A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

D. Copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years;

E. A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F. Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

G. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

9.2 Delivery to Members and Inspection.

A. Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Managers shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1 A, B and D, and a copy of this Agreement.

B. Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i) inspect and copy during normal business hours any of the Company records described in Sections 9.1A through G; and

(ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

C. Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, make a written request to the Managers for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year ended more than 30 days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager(s) that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within 30 days thereafter.

D. Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E. The Managers shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by a Manager(s) pursuant to a power of attorney from the Member.

9.3 Annual Statements.

A. Upon request, the Managers shall cause an annual report to be sent to each of the Members not later than 120 days after the close of the Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager that the financial statements were prepared without audit from the books and records of the Company.

B. The Managers shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Managers shall send or cause to be sent to each Member or Economic Interest Owner within 90 days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has 35 or fewer Members, a copy of the Company's federal, state and local income tax or information returns for that year.

C. The Managers shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code § 17060.

9.4 Financial and Other Information. The Managers shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Managers shall distribute to the Members, promptly after the preparation or

receipt thereof by the Managers, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5 Filings. The Managers, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Managers, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules and regulations. If a Manager required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document wit the California Secretary of State.

9.6 Bank Accounts. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7 Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8 Tax Matters for the Company Handled by Managers and Tax Matters Partner. The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

ARTICLE X
DISSOLUTION AND WINDING UP

10.1 Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

A. Upon the happening of any Dissolution Event specified in the Articles;

B. Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

C. Upon the vote of Members holding a Majority Interest or of non-defaulting Members holding a majority of the Percentage Interests held by all non-defaulting Members pursuant to Section 3.5C;

D. The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

E. The sale of all or substantially all of the assets of Company.

10.2 Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Managers who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

10.3 Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managers who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in section

The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Managers or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4 Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Managers or by the Members or if any Member objects by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5 Order of Payment of Liabilities Upon Dissolution.

A. After determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs. Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B. The payment of a debtor liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

(i) Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Managers to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii) The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6 Compliance with Regulations. All payments to the Members upon the winding and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d).

10.7 Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member except as provided in Article XI.

10.8 Certificate of Cancellation. The Managers or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9 No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Managers have failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his or her right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.10 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

ARTICLE XI
INDEMNIFICATION AND INSURANCE

11.1 Indemnification of Agents. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to

time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem appropriate in their business judgment.

11.2 Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

11.3 Advance Undertakings for Indemnification. To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, Company shall pay for or reimburse the reasonable expenses incurred by a Member or Manager in connection with any such proceeding as incurred in advance of final disposition of the action, suit, or proceeding thereof if *(i)* the person furnishes Company a written affirmation of the person's good faith belief that he, she or it has met the standard of conduct for indemnification described in Paragraph 10.5, *(ii)* the person furnishes Company a written undertaking, executed personally or on such person's behalf, to repay the advance if it is ultimately determined by a court of competent jurisdiction that such person did not meet such standard of conduct and that such person is not entitled to be indemnified, and *(iii)* a determination is made in accordance with the procedures set forth in Paragraph 10.6 that based upon facts then known to those making the determination, indemnification would not be precluded under this Article XI.

The undertaking described above must be a general obligation of the person, subject to such reasonable limitations as Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. Company shall indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the person in connection with the proceeding without the requirement of a determination as set forth above.

11.4 Advancement of Expenses. Upon demand by a Member or Manager for indemnification or advancement of expenses incurred in defending a civil or criminal suit or proceeding, as the case may be, Company shall expeditiously determine whether the Member or Manager is entitled thereto in accordance with this Article XI. The indemnification and advancement of expenses provided for under this Article XI shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Agreement.

11.5 Standards of Conduct Required for Indemnification. Indemnification of a Manager or Member is permissible under Paragraph 10.1 only if *(i)* the person conducted itself in good faith, and *(ii)* the person reasonably believed that its conduct was in or at least not opposed to Company's best interest; and *(iii)* in the case of any criminal proceeding, the person had no reasonable cause to believe his, her or its conduct was unlawful. The termination of a proceeding by judgment, order, settlement, conviction or

upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the person did not meet the standard of conduct described in this Paragraph 11.5.

11.6 Described Indemnification Rights as Non-Exhaustive. Nothing contained in this Article shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any person who is or was a Member or Manager of Company or is or was serving at Company's request as a director, officer, partner, Manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.

11.7 Construction of Indemnification Rights. Nothing contained in this Article XI shall limit the ability of Company to otherwise indemnify or advance expenses to any person. It is the intent of this Article to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Article XI. Indemnification shall be provided in accordance with this Article XI irrespective of the nature of the legal or equitable theory upon which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

11.8 Definitions for Indemnification Provisions.

A. "Expenses" mean all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

B. "Liabilities" mean the obligations (including one incurred by way of settlement) to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

C. "Party" means a person who was, or is threatened to be made a named defendant or respondent in a proceeding.

D. "Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

ARTICLE XII
MISCELLANEOUS

12.1 Counsel to the Company. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). The Company has initially selected Christopher R. Dryden, Esq. of Global Legal Resources, LLP ("Company Counsel") as legal counsel to the company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation. Each Member further acknowledges that Company Counsel has not represented the interests of any individual Member in the preparation and negotiation of this Agreement.

12.2 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Managers or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.4 Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Managers and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

12.5 Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the

context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.6 Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.7 Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.8 References to this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.9 Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

12.10 Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

12.11 Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.12 Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement and the transactions contemplated hereby.

12.13 Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.14 Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

12.15 Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

12.16 No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.17 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.18 Attorneys' Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover form the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

12.19 Time is of the Essence. All dates and times in this Agreement are of the essence.

12.20 Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

IN WITNESS WHEREOF, all of the Members of Charter Flight Group, LLC, a California limited liability company, have executed this Agreement, effective as of the date written above.

Member

Dated: 1-31, 2013

By: Jordan Brown
For: Bowman Aviation, Inc.



EXHIBIT 1, PAGE 77

Member

Dated: 1/31/13, 2013

By: Scott Biondo
For: SB Aviation, Inc.

Member

Dated: 1/31, 2013

By: Aaron Stanz

# VERIFICATION

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

I have read the foregoing **COUNTERCLAIMANTS SB AVIATION, INC. AND SCOTT BIONDO'S COUNTERCLAIMS AGAINST ONYX JET GROUP LLC, JORDAN BROWN, AARON STANZ, BOWMAN AVIATION, LLC, AND JET GENIUS, INC.** and know its contents.

I am an officer and the sole owner of Counterclaimant SB Aviation, Inc., a party to this action, and am authorized to make this verification for an on its behalf, and I make this verification for that reason. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I am informed and believe that they are true.

Executed on June 17, 2014, at San Diego, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: [signature]
Scott Biondo
SB Aviation, Inc.